JOHN W. HUBER, United States Attorney (No. 7726)
STEWART M. YOUNG, Assistant United States Attorney (No. 14377)
MARK Y. HIRATA, Assistant United States Attorney (No. 5087)
CY H. CASTLE, Assistant United States Attorney (No. 4808)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah  84111
Telephone:  (801) 524-5682

FILED
U.S. DISTRICT COURT

2017 OCT 18  A 11: 28

DISTRICT OF UTAH

BY:_____
    DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 2:17-cr-00208-CW |
| Plaintiff, | : | |
| v. | : | SECOND SUPERSEDING INDICTMENT |
| TERRY CHARLES DIEHL, | : | Vio. |
| Defendant. | : | 18 U.S.C. § 152(3) (False Declaration) Count 1 |
| | : | |
| | : | 26 U.S.C. § 7201 (Tax Evasion) Count 2 |
| | : | 26 U.S.C. § 7206(1) (Making and Subscribing to a False Tax Return) Count 3 |
| | : | |

The Grand Jury charges:

At all times relevant to this Second Superseding Indictment:

1

1.     Defendant TERRY CHARLES DIEHL ("defendant DIEHL") was a resident of Salt Lake County, Utah, and resided at a house on Prospector Drive in Salt Lake City, Utah 84121 ("Prospector Drive address").   Defendant DIEHL was primarily engaged in the business of real estate development and consulting.   Defendant DIEHL also was a member of the Utah Transit Authority's ("UTA") Board of Trustees from 2001 to 2011.

2.     Defendant DIEHL had two daughters, M.D.H. and B.J.D.   M.D.H. resided in Salt Lake City, Utah.   B.J.D. resided at various addresses in Dallas, Texas.

**SVA's Formation and Management**

3.     On or about November 22, 2011, defendant DIEHL caused Skyline Venture Associates, Inc. ("SVA") to be created as a corporation registered with the Utah Division of Corporations and Commercial Code, and owned by his daughters, M.D.H. and B.J.D. Although having no ownership interest in SVA on paper, during the period from around December 2011 up to and past May 2013, defendant DIEHL managed and controlled all of SVA's day-to-day business affairs and financial activities.

**SVA's Bank Account**

4.     On or about December 21, 2011, defendant DIEHL directed the opening of a business account (account number ending in 5224) under SVA at JPMorgan Chase Bank (the "SVA account"), listing his Prospector Drive address as SVA's business address.   The three authorized signers on the SVA account were M.D.H., B.J.D., and

2

K.M.   K.M. was defendant DIEHL's office manager and bookkeeper.   During the

period from December 2011 to May 2013, neither M.D.H. nor B.J.D. had any

involvement with managing or handling the SVA account.   During that same period, and

acting at defendant DIEHL's instruction and direction, K.M. conducted numerous

transactions involving funds transferred in and out of the SVA account, including

deposits, withdrawals, checks, wire transfers, and account-to-account transfers.

**Chapter 11 Bankruptcy – Background**

5.     A voluntary bankruptcy case is begun by the filing of a bankruptcy petition,

and the person who files that petition is a "debtor" under federal bankruptcy law.   A

debtor may file, among other petitions, a chapter 11 bankruptcy petition.   The process is

conducted in federal court and is governed by the United States Bankruptcy Code, which

is found in Title 11 of the United States Code.

6.     Upon the filing of a bankruptcy petition, a debtor is required by law to fully

disclose his or her financial circumstances, including, among other things, assets,

liabilities, income from prior years, current income, and any anticipated increase in

income.   Assets include real, personal, tangible, and intangible property, whether the

asset is held in the debtor's name or held in the name of another person or entity on

behalf of the debtor.   A bankruptcy "estate" is created upon the filing of a bankruptcy

petition, which is a collective reference to all legal or equitable interests of the debtor in

property at the time of the bankruptcy filing, including all property in which the debtor

3

has an interest, even if it is owned or held by another person.    The estate also includes

all property the debtor acquires after commencement of the case, including earnings from

services performed.

      7.     In an individual Chapter 11 bankruptcy, the debtor keeps possession and

control of the assets (referred to as the "debtor in possession") in the estate, while

attempting to reduce debt and reorganize his financial affairs under the watchful eyes of

the United States Trustee (a civil component of the U.S. Department of Justice),

creditors, an appointed unsecured creditors' committee, and the bankruptcy court.    The

bankruptcy system is based on the fundamental premise and requirement that a debtor

will make full disclosure of all assets and liabilities.    In short, the price of bankruptcy is

full disclosure.    Accordingly, a debtor in possession assumes the position of a fiduciary

(i.e., a person who has the power and obligation to act for another under circumstances

which require total trust, good faith, and honesty) of the debtor's bankruptcy estate.    The

debtor is required to file with the bankruptcy court, under penalty of perjury, documents

requiring full, accurate, and complete disclosure of his past and current financial status,

including, among other filings, a: (1) Summary of Schedules (e.g., Assets and Liabilities;

Current Income and Expenditures); and (2) Statement of Financial Affairs.

      8.     Additionally, the debtor in possession must file a disclosure statement and

plan of reorganization.    The purpose of the disclosure statement is to describe a debtor's

assets, liabilities, repayment to creditors, and business affairs sufficient to enable a

creditor to make an informed judgment about a debtor's plan of reorganization.   The

disclosure statement must be approved by the bankruptcy court.   The plan and approved

disclosure statement are provided to creditors for voting and, thereafter, the plan is

submitted to the bankruptcy court for confirmation.   To confirm a plan of

reorganization, the bankruptcy court must find, among other things, that the plan has been

proposed in good faith and not by any means forbidden by law.

**Defendant DIEHL's Chapter 11 Bankruptcy**

9.      On or about March 30, 2012, defendant DIEHL filed a voluntary petition

for relief under Chapter 11 of the U.S. Bankruptcy Code, Bankruptcy Case No. 12-24048,

in the United States Bankruptcy Court for the District of Utah.

10.     On or about April 13, 2012, defendant DIEHL filed a Statement of

Financial Affairs, under penalty of perjury, and made the following misrepresentations,

among others:

- **Questions 1 and 2 – Income from employment or operation of business** – These questions required defendant DIEHL to state, among other things, "the gross amount of income [he had] received from . . . operation of [his business] . . . during the **two years** immediately preceding this calendar year" and any other sources of income for that period (bolding in the original).   For the year 2011, defendant DIEHL falsely represented his gross business income as only **$376,708.83 and that he had no income from any other sources**.   In truth and fact, defendant DIEHL received **at least $1,000,000** in gross income from the operation of his business involving real property stemming from a UTA Front Runner transit oriented development in Draper, Utah.

- **Question 18 – Nature, location and name of business** – This question required defendant DIEHL to identify "all businesses in which [he] was an officer, director,

*or managing executive of a corporation,* . . . within **six years** immediately preceding the commencement of this case, . . . ." (bolding in the original and emphasis added). Under this section, defendant DIEHL concealed and falsely omitted SVA, a corporation for which he exclusively managed and controlled its day-to-day business affairs and activities.

11.     Following the creation of SVA, both prior to and during his bankruptcy, defendant DIEHL directed and facilitated the transfer of money under his control into and out of the SVA account. Some funds were disclosed to creditors, others were not. Undisclosed funds were used, in part, to pay defendant DIEHL's personal expenses during his bankruptcy.

## Count 1
## 18 U.S.C. § 152(3)
## (False Declaration)

12.     By this reference, the Grand Jury incorporates the allegations in paragraphs 1 through 11 above as if fully alleged herein.

13.     On or about the date alleged below, during a pending bankruptcy case in the United States Bankruptcy Court for the District of Utah, *In re Terry Charles Diehl*, Bankruptcy Case No. 12-24048, in the Central Division of the District of Utah,

**TERRY CHARLES DIEHL**,

defendant herein, knowingly and fraudulently made, and caused to be made, a material false declaration, certificate, and verification, under penalty of perjury, in the following bankruptcy filing:

6

| Count | Date of Filing | Title of Filing (Document Filing Number) / Material False Statement and Omission (amounts approximate) |
|-------|---------------|----------------------------------------------------------------------------------------------------|
| 1 | 04/13/2012 | Statement of Financial Affairs (doc. 14)<br>• False Statement: Questions 1 and 2: **$376,708.83** in gross income during 2011 (actual gross income: **at least $1,000,000**).<br>• Omission: Question 18: **SVA not listed.** |

In violation of 18 U.S.C. §§ 152(3) and 2(b).

## Count 2
## 26 U.S.C. § 7201
## (Tax Evasion)

14.    By this reference, the Grand Jury incorporates the factual allegations in paragraphs 1 through 11 above as if fully alleged herein.

## BACKGROUND

**Wasatch Pacific, Inc.**

15.    At all times relevant to this Superseding Indictment, Wasatch Pacific, Inc. ("Wasatch Pacific"), was a Utah corporation managed and controlled by defendant DIEHL.   Defendant DIEHL also managed and controlled a business account (account number ending in 2962) under Wasatch Pacific at JPMorgan Chase Bank (the "Wasatch Pacific account").   As of July 2011, the authorized signers on the account were K.M. and defendant DIEHL.   Beginning in or around July 2011, defendant DIEHL instructed and directed K.M. concerning funds transferred in and out of the Wasatch Pacific account, including deposits, withdrawals, checks, wire transfers, and account-to-account transfers.

**Skyline Ventures Group, LLC**

16.     Skyline Ventures Group, LLC ("SVG"), a Delaware limited liability company, was formed on or about October 14, 2011.   Defendant DIEHL and his daughters, B.J.D. and M.D.H., each held a one-third partnership interest in SVG. Defendant DIEHL managed and controlled SVG, along with a business account (account number ending in 5174) under SVG at JPMorgan Chase Bank (the "SVG account") opened on or about October 19, 2011.    The initial authorized signers on the SVG account were K.M. and defendant DIEHL.   Beginning on or about October 19, 2011, defendant DIEHL instructed and directed K.M. concerning funds transferred in and out of the SVG account, including deposits, withdrawals, checks, wire transfers, and account-to-account transfers.

17.     On or about November 18, 2011, defendant DIEHL received a $1,000,000 wire transfer to his Wasatch Pacific account for consulting services provided in connection with the sale of a property in Draper, Utah, to eBay Inc.

18.     On or about November 21, 2011, defendant DIEHL directed and caused K.M. to transfer $1,000,000 from the Wasatch Pacific account to the SVG account.   On or about that same date, defendant DIEHL also directed and caused K.M. to book those funds in SVG's QuickBooks records and to classify the deposit as "Proceeds from Sale of Assets."   At some point during the period from on or about December 31, 2011, to on or about September 13, 2012, and in connection with the preparation of the 2011 corporate

8

return for SVG, the $1,000,000 was reclassified by a staff accountant working under the supervision of B.D., defendant DIEHL's accountant, from "Proceeds from Sale of Assets" to "Management Fees."

19.     As of November 21, 2011, defendant DIEHL also managed and controlled a personal account (account number ending in 2954) under Terry C. Diehl or K.C.M. at JPMorgan Chase Bank (the "Diehl account").   The authorized signers on the Diehl account were K.M. and defendant DIEHL.

20.     During the period from on or about November 21, 2011, to on or about March 30, 2012, defendant DIEHL directed and caused K.M. to conduct the following transactions:

- Account-to-account transfers of funds between and among the SVG, Wasatch Pacific, Diehl, and SVA accounts; and

- Transfers out of the SVG, Wasatch Pacific, Diehl, and SVA accounts, including, among other transactions, checks, cash withdrawals, and wire transfers.

21.     At some point during the period from on or about September 13, 2012, to on or about September 17, 2012, B.D. spoke to defendant DIEHL over the telephone to find out more information about the circumstances underlying the $1,000,000 reclassified by B.D.'s staff accountant as "Management Fees."   In this telephone conversation, defendant DIEHL told B.D. that the $1,000,000:

- Has nothing to do with SVG;

- Is not a management fee to SVG;

9

- Is not income to SVG; and

- Is a capital contribution from defendant DIEHL to SVG.

In this same telephone conversation, defendant DIEHL did not disclose to B.D. that the

$1,000,000 was:

- Received initially through the Wasatch Pacific account as payment for consulting services; and

- Transferred at defendant DIEHL's instruction and direction from the Wasatch Pacific account to the SVG account.

22.     On or about September 17, 2012, and as a result of the information

defendant DIEHL provided to him over the phone, B.D. completed and caused to be

completed, and forwarded to defendant DIEHL the final draft 2011 SVG corporate return

which did not reflect any of the $1,000,000 as income to SVG.   Instead, the corporate

return reflected the $1,000,000 as a capital contribution from defendant DIEHL to SVG.

Based on defendant DIEHL's approval, B.D.'s firm filed electronically the final draft

2011 SVG corporate return, without changes, with the Internal Revenue Service on or

about September 17, 2012.

23.     On or about September 17, 2012, B.D. completed and caused to be

completed, and forwarded to defendant DIEHL, a final draft of the 2011 Wasatch Pacific

corporate return which also did not reflect any of the $1,000,000 as income to Wasatch

Pacific.   Defendant DIEHL signed the 2011 Wasatch Pacific corporate return, without

10

changes, and mailed the return, and caused the return to be mailed, to the Internal

Revenue Service on or about September 17, 2012.

24.    On or about October 15, 2012, B.D. and his firm also completed, and

forwarded to defendant DIEHL, a final draft of his 2011 personal return which also did

not reflect any of the $1,000,000 as income to defendant DIEHL.  Based on defendant

DIEHL's approval, B.D.'s firm filed electronically the final draft 2011 personal return,

without amendments, with the Internal Revenue Service on or about October 15, 2012.

## AFFIRMATIVE ACTS OF EVASION

25.    Defendant DIEHL committed, and caused the commission of, the following

acts in attempting to evade assessment by the Internal Revenue Service of the $1,000,000

received by Wasatch Pacific on or about November 18, 2011:

- On or about November 21, 2011, defendant DIEHL directed and caused K.M. to transfer $1,000,000 from the Wasatch Pacific account to the SVG account.

- On or about November 21, 2011, defendant DIEHL directed and caused K.M. to book those funds in SVG's QuickBooks records and to classify the deposit as "Proceeds from Sale of Assets."

- At some point during the period from on or about September 13, 2012, to on or about September 17, 2012, defendant DIEHL told his accountant, B.D., over the telephone that the $1,000,000: (1) has nothing to do with SVG; (2) is not a management fee to SVG: (3) is not income to SVG; and (4) is a capital contribution from defendant DIEHL to SVG.  During that same telephone discussion, defendant DIEHL did not disclose to his accountant that the $1,000,000 was: (1) received initially through the Wasatch Pacific account as payment for consulting services; and (2) transferred at defendant DIEHL's instruction and direction from the Wasatch Pacific account to the SVG account.

11

- On or about September 17, 2012, defendant DIEHL approved the final draft 2011 SVG corporate return which reflected the $1,000,000 as a capital contribution from defendant DIEHL to SVG. Based on defendant DIEHL's approval, B.D.'s firm filed electronically the final draft 2011 SVG corporate return with the Internal Revenue Service on or about September 17, 2012.

- On or about September 17, 2012, defendant DIEHL signed the 2011 Wasatch Pacific corporate return, which did not reflect any of the $1,000,000 as income to Wasatch Pacific, and mailed the return, and caused the return to be mailed, to the Internal Revenue Service on or about September 17, 2012.

- On or about October 15, 2012, defendant DIEHL approved a final draft of his 2011 personal return which did not reflect any of the $1,000,000 as income. Based on defendant DIEHL's approval, B.D.'s firm filed electronically the final draft 2011 personal return with the Internal Revenue Service on or about October 15, 2012.

26.     Had defendant DIEHL properly reported the $1,000,000 on the 2011 Wasatch Pacific corporate return, 94.444444 percent of this income would have flowed through Wasatch Pacific to defendant DIEHL's 2011 personal return. This income would have eliminated defendant DIEHL's net operating loss deduction for 2011 and resulted in a tax due and owing by defendant DIEHL. The elimination of the net operating loss deduction for 2011 also would have resulted in a tax due and owing by defendant DIEHL in tax year 2012. The total tax due and owing is in excess of $190,000.

27.     From around November 2011 and continuing into 2016, in the Central Division of the District of Utah,

**TERRY CHARLES DIEHL,**

12

defendant herein, did willfully attempt to evade and defeat the assessment of income tax

due and owing by him to the United States of America for the calendar year 2011 in an

amount in excess of $190,000, by, among other things: (1) attempting to conceal from the

Internal Revenue Service $1,000,000 received by defendant DIEHL's company, Wasatch

Pacific, in 2011; (2) transferring, and causing the transfer of, that $1,000,000 from

Wasatch Pacific to SVG, another company under defendant DIEHL's management and

control; (3) making false statements to his accountant, B.D., concerning the true nature

and circumstances under which defendant DIEHL received and used the $1,000,000; and

(4) causing the filing of defendant DIEHL's 2011 personal return, along with 2011

corporate returns for Wasatch Pacific and SVG; through the commission, and causing the

commission, of acts of evasion alleged in paragraph 25 above;

All in violation of 26 U.S.C. § 7201.

### Count 3
### 26 U.S.C. § 7206(1)
### (Making and Subscribing to a False Tax Return)

28.     By this reference, the Grand Jury incorporates the factual allegations in

paragraphs 1 through 11, and 15 through 26, above as if fully alleged herein.

29.     On or about September 17, 2012, in the Central Division of the District of

Utah,

### TERRY CHARLES DIEHL,

defendant herein, did willfully make and subscribe, and did willfully aid, abet, assist and

13

cause to be made and subscribed, a U.S. Corporation Income Tax Return (Form 1120S), for Wasatch Pacific, Inc., for the calendar year 2011, which was verified by a written declaration that it was made under the penalties of perjury and which defendant DIEHL did not believe to be true, which was filed with the Internal Revenue Service, wherein he reported on line 1a (Gross Receipts or Sales) a total of $0.00, whereas as defendant DIEHL then and there well knew and believed, this line item was false because the tax return failed to report material gross receipts received by Wasatch Pacific, Inc., during 2011;

All in violation of 26 U.S.C. § 7206(1).

### FORFEITURE ALLEGATIONS
**18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461**
**(Criminal Forfeiture)**

30.     Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), upon conviction of any offense in violation of 18 U.S.C. § 152, as set forth in this Second Superseding Indictment, the defendant shall forfeit to the United States of America all property, real or personal, that constitutes or is derived from proceeds traceable to any violation.   The property to be forfeited includes, but is not limited to, the following:

A money judgment equal to the value of all property, real or personal, which constitutes or is derived from proceeds traceable to any violation of 18 U.S.C. § 152.

31.     Substitute Assets: If the property described above as being subject to forfeiture, as a result of any act or omission of defendant DIEHL:

14

a.  Cannot be located upon the exercise of due diligence;

b.  Has been transferred or sold to, or deposited with, a third party;

c.  Has been placed beyond the jurisdiction of the Court;

d.  Has been substantially diminished in value; or

e.  Has been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b) and/or 28 U.S.C. § 2461, to seek to forfeit any other property of defendant DIEHL up to the value of the forfeitable property described above.

A TRUE BILL:

_____/s/_____
FOREPERSON OF THE GRAND JURY

APPROVED:

JOHN W. HUBER
United States Attorney

_____
STEWART M. YOUNG
MARK Y. HIRATA
CY H. CASTLE
Assistant United States Attorneys

15